UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

SCOTT HESSE,

    Plaintiff,

     v.

U.S. BANK NATIONAL ASSOCIATION
d/b/a U.S. BANK,

    Defendant.

Civil Action No.

COMPLAINT
JURY TRIAL REQUESTED
INJUNCTIVE RELIEF REQUESTED

NOW COMES the Plaintiff, Scott Hesse ("Mr. Hesse"), by and through undersigned

counsel, and complains against the Defendant, U.S. Bank National Association d/b/a U.S. Bank

("U.S. Bank"), as follows:

JURISDICTION AND PARTIES

1.     This action arises under the Maine Human Rights Act ("MHRA"), 5 M.R.S. §§

4551 *et seq.,* the District of Columbia Human Rights Act ("DCHRA"), D.C. Law §§ 2-1401.01 *et*

*seq.*, the District of Columbia Municipal Regulations Title 4 ("D.C. Mun. Reg."), and the

Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101 *et seq.*

2.     Mr. Hesse is a United States citizen residing in the Town of Belfast, County of

Waldo, State of Maine.

3.     U.S. Bank is a financial and bank holding company incorporated in the State of

Delaware.

4.     The headquarters for U.S. Bank is in the City of Minneapolis, State of

Minnesota.

5.      U.S. Bank is an employer in the District of Columbia and State of Maine.

6.      U.S. Bank had 500 or more employees for each working day in each of 20 or more calendar weeks in the same calendar year as when the alleged discrimination occurred.

7.      The amount in controversy is over $75,000.

8.      This Court has subject matter jurisdiction over Mr. Hesse's federal, District of Columbia, and state claims pursuant to 28 U.S.C. §§ 1331, 1332, and 1367.

9.      On or about May 23, 2022, Mr. Hesse filed a timely Complaint/Charge of Discrimination against U.S. Bank alleging unlawful disability discrimination and retaliation with the Maine Human Rights Commission ("MHRC") and the Equal Employment Opportunity Commission ("EEOC").

10.     On or about March 2, 2023 the MHRC issued a Notice of Right to Sue with respect to Mr. Hesse's state law claims.

11.     On or about March 7, 2023, the EEOC issued a Notice of Right to Sue with respect to Mr. Hesse's federal law claims.

12.     Mr. Hesse has exhausted his administrative remedies with respect to all claims requiring administrative exhaustion set forth in this Complaint.

## JURY TRIAL REQUESTED

13.     Mr. Hesse requests a trial by jury for all claims and issues for which a jury is permitted.

## FACTUAL ALLEGATIONS

14.     U.S. Bank provides banking, investment, mortgage, trust and payment services products to consumers, businesses, and institutions.

15.     Mr. Hesse started working for U.S. Bank as a Sales Manager in May 2008.

16.    Mr. Hesse's initial salary was $82,000.

17.    Mr. Hesse received pay raises including merit increases through July 2013 when he was promoted from Account Sales Rep 5 to Account Sales Rep 6.

18.    Mr. Hesse's salary after the promotion was $96,775.

19.    Mr. Hesse continued to receive pay raises and merit increases through July 2017.

20.    From Mr. Hesse's date of hire through July 2017, Mr. Hesse worked remotely from his home on Cape Hatteras, one of the barrier islands of North Carolina.

21.    In July 2017, Mr. Hesse was offered and accepted the position of Corporate Payment Solutions ("CPS") Relationship Manager starting on August 1, 2017.

22.    Mr. Hesse received a salary increase to $101,955.

23.    Mr. Hesse's job site was U.S. Bank's Washington, D.C. ("DC") office.

24.    Mr. Hesse kept his home in North Carolina and rented an apartment in DC.

25.    Donald "Scott" Helms, Senior Vice President, was the head of the U.S. Bank Government Service Administration Team in the DC office.

26.    Mr. Hesse was a member of the Government Services Administration Team.

27.    Mr. Helms was Mr. Hesse's immediate supervisor from August 2017 through some time in 2019 when Chris Chiappetta took over the role on paper.

28.    Mr. Chiappetta continued to defer to Mr. Helms for many decisions.

29.    When Mr. Chiappetta left U.S. Bank in August 2021, Sales Manager Patricia Acosta became Mr. Hesse's interim immediate supervisor.

30.    As a CPS Relationship Manager, Mr. Hesse's only clients were the United States Air Force ("Air Force", 2017 forward) and the National Credit Union Administration (2018-2019).

31.     After 2019, Mr. Hesse's sole client was the Air Force.

32.     The essential functions of Mr. Hesse's job are listed in the CPS Relationship Manager job description dated November 2019.

33.     There is nothing in the job description stating that working in the D.C. office was an essential function of Mr. Hesse's job.

34.     U.S. Bank asserts that it was an essential function for Mr. Hesse to (a) work in the DC office full or part time, and (b) be ready and able to meet with his client in person and assist his client on short notice.

35.     U.S. Bank told the MHRC that although it is not so stated in Mr. Hesse's job description, "U.S. Bank made a verbal commitment to [the Air Force] that its assigned Relationship Manager would be located in the Washington, D.C. area and available for in-person meetings on short notice."

36.     U.S. Bank did not submit evidence to support the claim made in paragraph 35 to the MHRC.

37.     At all times during his employment as a CPS Relationship Manager, Mr. Hesse communicated with his client every day via telephone, email, or WebEx.

38.     Mr. Hesse met with his client in person at the Pentagon or at U.S. Bank's DC office at most about four or five times per year. Each of those meetings was scheduled in advance, not on short notice.

39.     The Pentagon in DC was just one of the sites for the Air Force that Mr. Hesse worked with.

40.     Globally, there were about 70 Air Force sites that Mr. Hesse communicated with on a regular basis.

41.    The Air Force has hundreds of bases in more than 70 countries around the world.

42.    Mr. Hesse communicated with his client at many locations other than the Pentagon.

43.    Like most other U.S. Bank employees, Mr. Hesse started working remotely in 2020 when social distancing became an important tool to slow the COVID-19 pandemic.

44.    During 2020, 2021, and 2022, Mr. Hesse's sole client, the Air Force, was not having in-person meetings either due to the pandemic.

45.    Mr. Hesse participated in meetings with his client and with his colleagues remotely, via MS Teams and other platforms.

46.    The fact that Mr. Hesse did not work in U.S. Bank's DC office did not impair Mr. Hesse's ability to provide services to his client or to do his job in any way.

47.    Mr. Hesse's ability to perform his job effectively while working remotely from Maine is borne out by his positive 2021 Performance Review.

48.    Mr. Hesse has a pulmonary condition (asthma) that substantially limits his major life activity of breathing, particularly when viewed in the absence of mitigating measures.

49.    Mr. Hesse's condition has worsened over time. His condition is aggravated by poor air quality, pollution, high heat, and high humidity leading to significant discomfort.

50.    Mr. Hesse started to use two inhalers, ADVAIR for everyday use, and Albuterol for emergencies. He was short of breath walking upstairs and sometimes while just walking down the street. He had several urgent care visits for his condition.

51.    When Mr. Hesse began working remotely full time in 2020, he moved to Belfast, Maine.

52.    Mr. Hesse notified Human Resources that he moved.

53.    Mr. Hesse had never been told that employees are expected to ask permission before they relocate.

54.    When Mr. Helms learned that Mr. Hesse had moved to Maine, he asked when Mr. Hesse was coming back to DC. Mr. Hesse told Mr. Helms that he was hoping to stay in Maine.

55.    Mr. Hesse's pulmonary condition improved significantly when he moved to Maine.

56.    During a regular checkup appointment with his pulmonologist on July 15, 2021, Mr. Hesse's doctor advised him not to return to live/work in the DC area due to its effect on his asthma.

57.    There was no need for Mr. Hesse to request an accommodation from U.S. Bank at that time because he did not need an accommodation; he was permitted to work remotely from Maine.

58.    In August 2021, Mr. Hesse was notified that he was required to return to the DC office three days per week in the fourth quarter of 2021 (between October and December 2021).

59.    On information and belief, U.S. Bank leadership decided to require many of its employees to return to work without accounting for employees' rights under state and federal law for reasonable accommodations.

60.    U.S. Bank leadership implemented a policy of requiring certain employees to return to work in the office without reasonably considering and accounting for the rights of employees with disabilities under federal and state law.

61.    Realizing that he now needed an accommodation, Mr. Hesse submitted a letter from his pulmonologist to Mr. Chiappetta and Mr. Helms. The letter reads:

Mr. Scott Hesse is a patient who I care for at Waldo County General Hospital, Pulmonary Disease Clinic in Belfast, ME. Mr. Hesse has a significant respiratory condition that is

severely triggered by environmental conditions such as heat and humidity, pollutants as well as various environmental allergens.

Mr. Hesse had recurrent problems with need for Emergency department visits and hospitalization when previously residing in the Washington DC area. His active disease and recurrent, severe symptoms were very likely due to daily exposure from the above severe heat and humidity, pollution and ambient allergens.

For health purposes, I strongly recommend that Mr. Hesse not be required to relocate back to the DC area but rather be allowed to continue his employment here in this Maine locale, where his respiratory condition has been under much better control.

Any questions I can be contacted at the Pulmonary Disease office, 207-xxx -xxxx.

62.     On August 18, 2021, Mr. Hesse submitted a request to Employee Relations (aka HR Advisory Services) to permit him to continue working from home as a reasonable accommodation for his disability.

63.     Mr. Hesse's contact person in Employee Relations was Cindy Hutton.

64.     On August 19, 2021, Ms. Hutton emailed Mr. Hesse to schedule a time to discuss his request.

65.     Mr. Hesse met with Ms. Hutton via Webex (audio only) on August 24, 2021.

66.     Ms. Hutton told Mr. Hesse about a form that she was going to provide that would require responses from his doctor.

67.     On August 25, 2021, Mr. Hesse followed up by email and asked Ms. Hutton to send him the form for his doctor to complete.

68.     Ms. Hutton told Mr. Hesse that she would send him the form when it was prepared.

69.     On August 27, 2021, Mr. Hesse inquired again about Ms. Hutton sending him the form.

70.     Ms. Hutton said she would send it to Mr. Hesse by the following Tuesday.

71.     On August 31, 2021, Ms. Hutton sent Mr. Hesse a Confidential Memorandum that included a form for his health care provider to complete. She asked Mr. Hesse to return the form by September 15, 2021.

72.     On September 3, 2021, Mr. Hesse submitted the form completed by his pulmonologist along with the letter he previously wrote.

73.     The form completed by Mr. Hesse's pulmonologist contained the following information:

   a.   Mr. Hesse has a significant respiratory condition that is severely triggered by environmental conditions such as heat and humidity, pollutants, as well as various environmental allergens.

   b.   Although these issues could be lifelong without proper treatment and remediation, Mr. Hesse has shown improvement while under the doctor's care in Belfast, Maine.

   c.   The difficulty for Mr. Hesse living and working in an urban area such as Washington, DC is that it would severely inflame his respiratory difficulties due to the daily exposure to heat, humidity, pollutants, and ambient allergens. Mr. Hesse would place himself in danger if he lived in a compromised breathing environment.

   d.   Working from home in somewhat rural Maine should aid in Mr. Hesse's breathing capacity to continue to improve.

74.     Mr. Hesse checked in with Ms. Hutton frequently during the month of September 2021 asking for a response to his accommodation request.

75.    The October 2021 deadline for Mr. Hesse to return to work in the Washington, DC office arrived and he still had no response to his request.

76.    Finally, on October 25, 2021, Mr. Hesse received a reply from Ms. Hutton. Her letter read:

> We have received and reviewed your ADA accommodation request. Unfortunately, we are unable to grant your request. You are currently a hybrid employee, expected to work in the office at our Washington, D.C. site an average of three days per week. You have been temporarily working from home as a result of the COVID-19 pandemic, but you are expected to return to the office on January 10, 2022.  You have indicated you moved to Maine, and you have requested to continue to work from home full-time, on a permanent basis.
>
> Unfortunately, we cannot grant your request, because the essential functions of your position require you to live in the Washington, D.C. area. Your position at the Bank as a CPS Relationship Manager requires that you manage all relationship management activities for clients in the assigned business segment or geographical region.  Your assigned business segment is currently the United States Air Force in Washington, D.C. One of the expectations of this client is that our CPS Relationship Manager will be ready and able to meet with them in person to assist them on short notice.
>
> During your interview for this position, your managers explained that your job duties would require you to be available to meet with the client on short notice, and that this was not a position that can be performed remotely. At the time, you lived in North Carolina, and it was with this understanding that you agreed to relocate to Washington, D.C.  Our business needs have not changed since then, and being located near Washington, D.C. remains an essential function of the position.
>
> Although we cannot grant your particular request, we remain open to discussing alternatives that might assist you in performing your job functions. If you have any other requests, please open another case with Employee Services for further assistance."

77.    Being "ready and able to meet with the client in person to assist them on short notice" is not listed as an essential function in Mr. Hesse's job description.

78.    Even if being "ready and able to meet with the client in person to assist them on short notice" was considered an essential function of Mr. Hesse's job, he had been performing that essential function successfully for one and a half years while living in Belfast, Maine.

79.    On November 30, 2021, at 3:47 PM, Mr. Hesse wrote to Ms. Hutton, Natalie Smith (Ms. Hutton's supervisor), Mr. Helms, and Ms. Acosta to renew his request:

I am writing to renew my request for reasonable accommodation and to protest US Bank's decision to mandate my return to work at the office in Washington D.C. by January 10, 2022.
As you know, I am a Relationship Manager, and my sole client is the US Air Force. I have a disability – asthma. When I worked in DC, I became short of breath when walking down the street or up stairs, even when I was using medications to treat my asthma.

My disability no longer allows me to work in an urban setting like Washington DC because the poor air quality and pollution makes it difficult for me to breathe. I provided US Bank with a letter from my doctor confirming that I have a breathing disability and that I must continue to work remotely, from rural Maine, which I have been doing successfully for over a year because of the COVID pandemic.

I explained to Scott Helms and Chris Chiappetta that if there is a business need for me to do so, I can travel to DC for in person meetings with my client or with US Bank managers. Feel free to contact my doctor if you would like to confirm this. Or, let me know if you would like me to get a note from my doctor confirming that I may travel to DC.

I believe that my request for accommodation is reasonable and does not pose an undue hardship. I believe that US Bank will be in violation of the Americans with Disabilities Act and the Maine Human Rights Act if it denies my request for accommodation.

I do not believe that it is appropriate or legal for US Bank to offer me a demotion when it does not pose an undue hardship to accommodate me in my own position. Transferring an employee with a disability to another job is an accommodation of last resort that can only be offered if the employee cannot perform their own position with accommodations. Further, as I explained to Patti Acosta and Scott Helms I am not qualified to perform as an Account Manager; the position that was offered, so the proposal is not feasible.

In short, I am asking US Bank to continue allowing me to work from home in Maine in my position as Relationship Manager, with the understanding that I will travel to DC as necessary for in person meetings. Please let me know if you need further information from me or my doctor. Please let me know by December 15th if my request has been approved.

Thank you.

80.     On December 10, 2021, Ms. Hutton responded by email and denied Mr. Hesse's request again on the grounds that working from home allegedly eliminated an essential function of his job.

81.     Ms. Hutton also stated that reimbursing Mr. Hesse for the cost of frequent long-distance travel between Maine and the Washington DC area was unreasonably burdensome.

82.    Ms. Hutton reiterated U.S. Bank's demand that Mr. Hesse return to work in the office on January 10, 2022.

83.    On December 13, 2021, Mr. Hesse responded to Ms. Hutton in an email that he sent to her with copies to Ms. Smith, Mr. Helms, and Ms. Acosta. Mr. Hesse wrote:

> As I understand it, you are concerned that if I continue to work from home in Maine, as I have been doing successfully for the last year and nine months, I will not be available to visit my client on-site at their demand and on short notice. You are also concerned about the cost.
>
> I believe that your concerns are unfounded. Since I started my role as the Relationship Manager for the Air Force in August of 2017, the USAF has not once requested a face-to-face meeting that needed to occur rapidly. We only had about four face-to-face meetings a year all of which were scheduled well in advance: usually weeks in advance. I can and will be available for meetings with my client and will do so on short notice. I am confident that it will work if we give it a try. I believe that the Americans with Disabilities Act permits employers to try an accommodation and discontinue if it is not successful.  I have successfully met this function of my job over the last year and nine months while living in Maine. This is powerful evidence that I can perform this aspect of my job from Maine.
>
> With regard to cost, I am willing and able to shoulder the cost of the travel, if necessary. However, I would point out that the ADA judges whether the expense of an accommodation is an undue hardship based on the overall financial resources of the employer, the number of persons employed, and the effect on overall expenses.
>
> Please let me know as soon as possible if US Bank will allow me a six month trial period to see if the accommodation I am asking for works for my client and US Bank.
>
> Thank you.

84.    Less than three hours later, Ms. Hutton responded by email and told Mr. Hesse that U.S. Bank was "unable" to grant his request and that they again stated that he could move to an area with better air quality within two hours of DC.

85.    U.S. Bank extended the deadline for Mr. Hesse to return to the office from January 10, 2022, to February 21, 2022.

86.     Mr. Helms asked to have a meeting with Mr. Hesse and the rest of the

Government Services Administration Team in the DC office on February 23, 2022.

87.     On February 8, 2022, Mr. Hesse's pulmonologist wrote another letter in support

of his request for accommodation. The doctor wrote:

Mr. Scott Hesse is under my care at Waldo County General Hospital, Pulmonary Disease
Clinic in Belfast, ME. Mr. Hesse suffers from severe allergic asthma that is easily triggered by
environmental conditions such as heat, humidity, pollutants and various environmental
allergens.

When Mr. Hesse worked and resided in the Washington DC Metroplex he routinely
experienced difficulty with controlling his asthma. Because of the severity of his
persistent symptoms he required unscheduled health care provider appointments and
was also treated on several occasions in emergency departments while living in the DC
area. These symptoms were due to exacerbations of his asthma likely due to exposures
to heat, humidity and pollutants from motor vehicles in the area.

Data from a fact sheet of the Union of Concern[ed] Scientists indicates that for cities
along the Atlantic mid Coast and the Northeast Coastal area of the United States,
pollution levels including particulate matter concentrations are the highest in the
Washington DC area. Pollution/particulate levels are also high in the states of New
York, New Jersey, Maryland and Virginia. In comparison, they are much lower in the
states of Vermont and Maine. This is thought to be due to the obviously lower
population densities and motor vehicle traffic in Vermont and Maine in contrast to
those mid-Atlantic cities such as Washington DC, Baltimore and New York City. Mr.
Hesse's severe asthma symptoms with need for Emergency department visits and
hospitalization when residing in the Washington DC area were again very likely due to
these daily exposures from the ambient heat/humidity, pollution and environmental
allergens.

Currently, Mr. Hesse is under quite good control from his asthma with no history of
unscheduled physician visits or emergency department care. He is maintained  well on
a combination inhaled steroid and long acting bronchodilator and is not requiring
excess use of rescue inhalers because of acute symptoms. In my opinion this is very
likely due to the change in environment, living in the state of Maine with its milder
summer seasonal climate and low ambient pollution levels including particulates,
compared to the mid Atlantic areas such as Washington DC, Baltimore and Virginia.

I believe if Mr. Hesse was required to move back to the Washington DC Metroplex or
other communities in Maryland or Virginia, he would begin to experience severe
asthma symptoms due to the above mentioned factors. This in turn would again make

it much more difficult as he previously experienced living in Washington DC, for him to achieve and maintain adequate control of his asthma symptoms.

It is therefore my medical recommendation as a pulmonologist caring for his respiratory conditions that he be allowed to remain in the state of Maine and work remotely from home. According to Mr. Hesse he is able to perform his job duties remotely without difficulty and at the same time experience much better quality of life because of improved and sustained asthma control.

Yours most sincerely,

88.     On February 9, 2022, at 11:25 AM, Mr. Hesse submitted his pulmonologist's letter by email to Ms. Hutton and Mr. Helms, with a copy to Ms. Smith and Ms. Acosta, along with this message:

I am writing to respond to your December 13th email regarding my request for reasonable accommodation.  In your letter you indicated that US Bank would permit me to work remotely from home if I lived within two hours of Washington.  I have consulted with my doctor on this proposal, and he has advised me that the air quality issues which exacerbate the symptoms of my asthma are present throughout the Washington metro area and the whole Mid-Atlantic area.  He has advised me that if I were to move to a home within a two hour drive of Washington that the air quality would again cause me to experience severe asthma symptoms. My understanding is that my Pulmonologist, Dr. [name omitted], is sending a copy of his letter to you.  I am attaching a copy of his letter to this email as well.  When I spoke to Dr. [name omitted] he reiterated that he is willing to speak with you if you have any questions for him.

Where relocating to the Washington metro area would cause my severe asthma symptoms to resume, I do not believe this would be a reasonable accommodation for me where the point of the accommodation is to allow me to live without these severe asthma symptoms and do not believe it complies with the requirements of the ADA or the Maine Human Rights Act. Dr. [name omitted] believes that so long as I continue to live in Maine that my symptoms will remain under control.  As I mentioned in past emails, I can and will be available for meetings with my client and will do so on short notice. Permitting me to perform my job while living in Maine has worked and worked well over the last two years and I am confident that it will continue to work well.

Please let me know if you have any questions for me or Dr. [name omitted].

Thank you.

89.     On February 17, 2022, Ms. Hutton replied and reiterated that U.S. Bank would not accommodate Mr. Hesse living in Maine.

90.     Ms. Hutton mentioned for the first time that Mr. Hesse needed to live in the DC area so that he could attend "Moments that Matter" with his team, in person.

91.     Ms. Hutton also stated that Mr. Hesse could apply for a remote position and work through the selection process for such a position.

92.     Ms. Hutton and U.S. Bank did not offer to transfer Mr. Hesse to a vacant position.

93.     Mr. Hesse had the right to apply and compete for any position with U.S. Bank, therefore, Ms. Hutton's suggestion was not an offer of a reasonable accommodation.

94.     "Moments that Matter" were a new team meeting initiative that started in January 2022.

95.     There was no need for Mr. Hesse to be present in person at the DC office for Moments that Matter.

96.     Other members of the Government Services Administration Team attended those meetings remotely from North Dakota and Germany.

97.     Mr. Hesse participated in the February 23, 2022 "Moments that Matter" with his team remotely from his home office in Maine.

98.     Other members of the Government Services Administration Team were also in attendance remotely.

99.     Mr. Hesse attended via Microsoft Teams, a communication platform.

100.    Mr. Hesse kept his camera on the whole time and spoke up so that everyone would know that he was present.

101. On March 2, 2022, Mr. Helms messaged Mr. Hesse via Teams to request a phone call.

102. Mr. Helms called and asked Mr. Hesse why he did not attend the "Moments that Matter".

103. Mr. Hesse told Mr. Helms he was there virtually, something Mr. Helms would have known because Mr. Hesse could be seen and heard during the meeting.

104. Mr. Helms asked why Mr. Hesse did not let him (Mr. Helms) know that he was not coming in person to the DC office for the meeting.

105. Mr. Hesse told Mr. Helms that his request for accommodation was still under discussion and had not been resolved and he assumed that it was understood that he would join the meeting on February 23 via Teams.

106. Mr. Hesse told Mr. Helms that email had not been an efficient or effective way to reach an agreement on his need for an accommodation. Mr. Hesse suggested that they have an actual conversation about it involving Mr. Hesse, Mr. Helms, Ms. Acosta, and Ms. Hutton.

107. Mr. Helms told Mr. Hesse he would consult with others about his idea and get back with him.

108. Mr. Hesse waited over a week to hear back from U.S. Bank.

109. On March 10, 2022, Mr. Hesse emailed Mr. Helms, with a copy to Ms. Acosta, and wrote:

> Just thought I would check in to see if you have made any progress on my request for a meeting to discuss mutually acceptable accommodations for my breathing disability. Since our conversation via telephone on March 2nd I thought we might have something in the schedule soon.
> Please let me know when would be a good time for you and the U.S. Bank team to discuss.
> Thank you.
> Take care. Hope to talk with you soon.

110. More than a week went by before Mr. Helms replied by email on March 18, 2022:

Your accommodation request was addressed in the emails from Cindy Hutton on 12/13/21 and 2/17/22 (moving within 2 hours of DC which aligns with the hybrid classification of your position). In our conversation on 3/2 you stated that you would continue to reside in Maine. There has been no change in the bank's position.

111.    The next time Mr. Hesse heard from U.S. Bank about his accommodation request was on April 1, 2022, at about 1 PM.

112.    Mr. Helms and Ms. Acosta called and told Mr. Hesse that he had to let them know within one hour if he would resign or accept retirement and if not, U.S. Bank would fire him involuntarily.

113.    Mr. Hesse resigned on April 1, 2022, to avoid being fired. He wrote to Mr. Helms and Ms. Acosta:

As requested I am writing to inform you that I am resigning from my role as Relationship Manager at U.S. Bank effective today. My decision was based on the choice you offered during our phone conversation today giving me an hour to either resign or face involuntary termination also effective today.

114.    U.S. Bank has characterized Mr. Hesse's separation from employment as a "retirement", which is not true. U.S. Bank gave Mr. Hesse the choice to resign, retire, or be fired and he chose to resign.

115.    Mr. Hesse's salary at the time of his forced resignation was $122,270 plus significant bonuses.

116.    U.S. Bank initially refused to pay Mr. Hesse's accrued vacation on the basis that Mr. Hesse had not given them notice of resignation which was frustrating considering that U.S. Bank told Mr. Hesse that he had one hour to resign.

117.    Mr. Hesse pointed out to HR that his resignation was forced. Mr. Hesse was eventually provided his accrued vacation pay.

118.    U.S. Bank had a continuing need for a CPS Relationship Manager to work with the Air Force after it forced Mr. Hesse to resign.

119.    U.S. Bank hired Leslie White to replace Mr. Hesse, effective June 13, 2022.

120.    Ms. White has no disability known to U.S. Bank.

121.    The Air Force continued to work remotely at the time U.S. Bank forced Mr. Hesse to resign.

122.    Ms. White resigned in February 2023.

123.    Upon information and belief, Ms. White had no in-person meetings with the Air Force while employed as the CPS Relationship Manager for the Air Force.

124.    Upon information and belief, there is no agreement, Task Order, or contract between U.S. Bank and the General Services Administration/Department of Defense/Air Force stating that the CPS Relationship Manager assigned to work with the Air Force would live and work in DC or the DC area.

125.    Even if there was an agreement with the Air Force to have the CPS Relationship Manager live in DC or the DC area, U.S. Bank had an obligation to see if the Air Force objected to a change in the agreement to accommodate Mr. Hesse.

126.    Michael N. Hogan was one of Mr. Hesse's contacts at the Air Force in Mr. Hesse's role as a CPS Relationship Manager for U.S. Bank.

127.    Upon information and belief, U.S. Bank did not reach out to Mr. Hogan directly or indirectly to see if the Air Force could accommodate Mr. Hesse working remotely, or to see if the Air Force had a current or ongoing need for Mr. Hesse to work in DC or the DC area.

128.    Employers may not use a contractual relationship to avoid complying with the MHRA or ADA.

129.     Any practice which has the effect or consequences of violating any provision of the DCHRA is deemed to be an unlawful discriminatory practice. § 2–1402.68

130.     Mr. Hesse is a person with a disability as that term is defined by the MHRA, the ADA, and the DCHRA. Mr. Hesse was also regarded as a person with a disability by U.S. Bank.

131.     Mr. Hesse requested a reasonable accommodation for his disability, i.e., permission to work remotely from Maine.

132.     For over two years, working remotely from Maine enabled Mr. Hesse to perform his job with significantly less difficulty breathing, less pain, less need to take medications, fewer trips for urgent care, and decreased risk to his health and safety.

133.     Mr. Hesse's working remotely did not eliminate an essential function of Mr. Hesse's job.

134.     Mr. Hesse's working remotely did not pose an undue burden on U.S. Bank.

135.     U.S. Bank failed to engage fully in the interactive process by refusing to meet with Mr. Hesse face to face to discuss his request and failing to speak directly with Mr. Hesse's medical provider about why his request was medically necessary.

136.     US Bank made a policy decision to bring the majority of its employees who had worked remotely during the height of the pandemic back to the office.

137.     In implementing this policy, US Bank disregarded the ADA, the MHRA, and the DCHRA and blatantly violated the rights of Mr. Hesse and likely many other employees with disabilities.

138.     U.S. Bank violated Mr. Hesse's rights by denying Mr. Hesse the accommodation he requested and needed because of his disability.

139.    U.S. Bank violated Mr. Hesse's rights by not offering Mr. Hesse an accommodation that was equally effective as the one he requested.

140.    U.S. Bank violated Mr. Hesse's rights by terminating his employment because of his request for accommodation and for reasons that could be addressed by accommodation.

141.    U.S. Bank violated Mr. Hesse's rights by telling Mr. Hesse to retire/resign or be fired because of his disability and because he requested an accommodation.

142.    Defendant relied in part on Plaintiff's disability when deciding to discharge Plaintiff.

143.    Plaintiff's disability was relevant to Defendant's decision.

144.    Defendant discriminated against Plaintiff, an employee with a disability, and a qualified individual with a disability, in regard to the terms and conditions of employment and termination.

145.    Defendant failed to make reasonable accommodations to the known physical limitations of Plaintiff, an otherwise qualified individual with a disability who was an employee.

146.    Defendant cannot demonstrate that the accommodation Plaintiff requested would impose an undue hardship on the operation of the business of Defendant.

147.    Defendant acted with knowing and/or reckless disregard for Plaintiff's state, federal and DC rights when it engaged in the unlawful actions set out in this Complaint.

148.    As a result of Defendant's actions Plaintiff has suffered lost wages and other economic and non-economic damages.

149.    Defendant's actions have caused Plaintiff stress, anxiety, loss to career, and loss to reputation.

<u>COUNT I: MHRA – Disability Discrimination</u>

150.    Paragraphs 1-149 are incorporated by reference.

151.    Defendant engaged in unlawful disability discrimination in violation of the MHRA.

COUNT II: MHRA – Failure to Accommodate

152.    Paragraphs 1-151 are incorporated by reference.

153.    Defendant violated the MHRA by not making a reasonable accommodation to the known physical limitations of Plaintiff, an otherwise qualified individual with a disability.

COUNT III: MHRA – Retaliation

154.    Paragraphs 1-153 are incorporated by reference.

155.    Defendant's conduct violates the MHRA's prohibition against coercing, intimidating, threatening or interfering with any individual in the exercise or enjoyment of the rights granted or protected by the MHRA, including the right to request a reasonable accommodation.

COUNT IV: ADA – Disability Discrimination

156.    Paragraphs 1-155 are incorporated by reference.

157.    Defendant engaged in unlawful disability discrimination in violation of the ADA.

COUNT V: ADA – Failure to Accommodate

158.    Paragraphs 1-157 are incorporated by reference.

159.    Defendant violated the ADA by not making a reasonable accommodation to the known physical limitations of Plaintiff, an otherwise qualified individual with a disability.

COUNT VI: ADA – Retaliation

160.    Paragraphs 1-159 are incorporated by reference.

161.    Defendant's conduct violates the ADA's prohibition against coercing, intimidating, threatening, or interfering with any individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed, any right granted or protected by the ADA, including the right to request a reasonable accommodation.

<u>COUNT VII: DCHRA – Disability Discrimination</u>

162.    Paragraphs 1-161 are incorporated by reference.

163.    Plaintiff performed work for Defendant in DC in the past and discriminatory and unlawful acts set out in this Complaint occurred, in part, in DC.

164.    The DCHRA provides that "[a]ny person claiming to be aggrieved by an unlawful discriminatory practice shall have a cause of action in any court of competent jurisdiction for damages and such other remedies as may be appropriate."

165.    This DCHRA reflects a legislative intention for the law to be enforced in any court of competent jurisdiction and the U.S. District Court for the District of Maine is a court of competent jurisdiction.

166.    Defendant engaged in unlawful disability discrimination in violation of the DCHRA.

<u>COUNT VIII: DCHRA –Failure to Accommodate</u>

167.    Paragraphs 1-166 are incorporated by reference.

168.    The District of Columbia Office of Human Rights (DCOHR) and the District of Columbia Commission on Human Rights (DCCHR), through their Regulations, have adopted and incorporated by reference current regulations of the federal Equal Employment Opportunity Commission (EEOC). D.C. Mun. Regs tit. 4 §500.2.

169.    The DCOHR and the DCCHR have, through their regulations, adopted and incorporated by reference the provisions promulgated by the EEOC and published at 29 CFR § 1613.701 *et seq*. relating to discrimination on the basis of disability. D.C. Mun. Regs tit. 4 §514.1.

170.    EEOC regulations provide that it is unlawful for a covered entity not to make reasonable accommodation to the known physical limitations of an otherwise qualified employee with a disability, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of its business.  29 C.F.R. §1630.9(a).

171.    The DCOHR and the DCCHR, through their regulations, require that where an employee's specific physical or mental disability precludes the normal operation of a business or particular activity in existing structures, reasonable accommodation shall be made, where possible, through modifications in job description, workplace design, or physical renovation. D.C. Mun. Regs tit. 4 §514.10

172.    The DCOHR and the DCCHR, through their regulations, require that employers shall retain employees who have become disabled while on the job so long as reasonable accommodation can be made. D.C. Mun. Regs tit. 4 §414.12.

173.    Defendant's conduct violated the DCHRA and its regulations by not making a reasonable accommodation to the known physical limitations of Plaintiff, an otherwise qualified individual with a disability

<u>COUNT IX: DCHRA – Retaliation</u>

174.    Paragraphs 1-173 are incorporated by reference.

175.    Defendant's conduct violates the DCHRA's prohibition against coercing, threatening, retaliating against, or interfering with any person in the exercise or enjoyment of

any right granted or protected under the DCHRA, including the right to request a reasonable accommodation.

<u>PRAYER FOR RELIEF</u>

Plaintiff respectfully requests that the Court grant the following relief:

A.    Declare the conduct engaged in by Defendant to be in violation of his rights;

B.    Enjoin Defendant, its agents, successors, employees, and those acting in concert with it from continuing to violate his rights;

C.    Order Defendant to reinstate Plaintiff or award front pay to Plaintiff;

D.    Award lost future earnings to compensate Plaintiff for the diminution in expected earnings caused by Defendant's discrimination;

E.    Award equitable-relief for back pay, benefits and prejudgment interest;

F.    Award compensatory damages in an amount to be determined at trial;

G.    Award punitive damages in an amount to be determined at trial;

H.    Award nominal damages;

I.    Award attorney's fees, including legal expenses, and costs;

J.    Award prejudgment interest;

K.    Permanently enjoin Defendant from engaging in any employment practices which discriminate on the basis of disability;

L.    Require Defendant to mail a letter to all employees notifying them of the verdict against them and stating that Defendant will not tolerate discrimination in the future;

M.    Require that Defendant post a notice in all of its workplaces of the verdict and a copy of the Court's order for injunctive relief;

N.      Require that Defendant train all management level employees on the protections afforded by the MHRA, ADA and DCHRA;

O.      Require that Defendant place a document in Plaintiff's personnel file which explains that Defendant unlawfully terminated him because of disability; and

P.      Grant to Plaintiff such other and further relief as may be just and proper.


Dated:  March 7, 2023                         */s/* Chad T. Hansen
                                         Chad T. Hansen

                                         /s/ Martin P. Tartre
                                         Martin P. Tartre

                                         Attorneys for the Plaintiff

                                         EMPLOYEE RIGHTS GROUP
                                         92 Exchange Street 2nd floor
                                         Portland, Maine 04101
                                         Tel. (207) 874-0905
                                         Fax (207) 874-0343
                                         Chad@EmployeeRightsLaw.Attorney
                                         Martin@EmployeeRightsLaw.Attorney